# EXHIBIT A

US_ACTIVE-102688161.2

## CONSTRUCTION LOAN AGREEMENT

THIS AGREEMENT, made the 15th day of February, 2007, by and between WACHOVIA BANK, NATIONAL ASSOCIATION, a national banking association, with an office at PA 1245, 123 South Broad Street, Philadelphia, Pennsylvania 19109 ("Lender"), and LAMPLIGHTER VILLAGE ASSOCIATES, L.P., a Pennsylvania limited partnership, with an office at 1243 Easton Road, Suite 200, Warrington, Pennsylvania 18976 (hereinafter collectively referred to as "Borrower").

## W I T N E S S E T H :

A. Borrower is the owner of certain real estate known as Phase III of the Villas of Lamplighter Village, consisting of thirty-six (36) building lots (each a "Lot") as shown on the Subdivision Plan dated May 24, 2002, last revised December 28, 2006 (the "Plan") prepared by Charles E. Shoemaker, Inc., such land being located in Warrington Township, Bucks County, Pennsylvania ("Real Estate"). The Real Estate is more fully described in the mortgage referred to in Section 2 hereof.

B. Borrower desires to construct or cause to be constructed on the Real Estate within the time hereinafter set forth, (i) 36 detached age-restricted dwelling units (each a "Unit") and (ii) water and sanitary sewer lines and roadways (the "Improvements") on the Real Estate to service the Units in accordance with certain plans and specifications (the "Plans and Specifications"), copies of which, initialed by Borrower for identification purposes, have been deposited with Lender. The Units and the Site Improvements are sometimes referred to collectively as the "Improvements".

C. Borrower has applied to Lender for a loan to re-finance the cost of the Real Estate and to finance the cost of construction of the Improvements.

NOW, THEREFORE, the parties hereto, intending to be legally bound hereby, agree as follows:

1. Loan.

Subject to the terms and conditions herein set forth, Lender agrees to lend, and Borrower agrees to borrow, a sum aggregating not in excess of $7,800,429 that, including all Completion Assurance Agreements, as hereinafter defined, at no time shall have an outstanding principal balance in excess of $3,000,000 (the "Loan"). Portions of the Loan advanced to pay for the "Hard Costs" of construction of Units may be reborrowed from time to time in accordance with the terms of this Agreement.

2. Security.

2.1. The Loan shall be advanced by Lender in installments as hereinafter provided, and shall be evidenced by Borrower's note (the "Note") executed simultaneously herewith.

2.2. As security for the Loan and for the obligations of Borrower hereunder, Borrower shall deliver to Lender the following:

2.2.1. A mortgage and security agreement (the "Mortgage"), executed by Borrower covering the Real Estate, all easements appurtenant to or benefiting the Real Estate, the Improvements that are part of the Real Estate and all fixtures, machinery and equipment necessary or incidental to the general operation and maintenance thereof, all renewals and replacements thereof or additions thereto, all as more specifically described in the Mortgage. (All of the foregoing are sometimes hereinafter collectively referred to as the "Mortgaged Property"). The Mortgage shall be a continuing first lien in the full amount of the Loan on a good and marketable fee simple title to the Mortgaged Property, free and clear of all prior liens (including mechanics' liens, filed or unfiled), restrictions, easements and other encumbrances and title objections that are not approved by Lender, and shall be insured as such at Borrower's expense by a reputable title insurance company satisfactory to Lender.

2.2.2. A joint and several personal guaranty and suretyship agreement signed by Marvin Katz and Steven Katz (the "Guarantors").

2.2.3. Such additional security agreements, financing statements and other security instruments, creating a valid first lien upon the aforesaid fixtures, machinery, equipment and other property now or hereafter located upon the Real Estate as the Lender may reasonably require.

2.2.4. An assignment of Borrower's rights in, to and under a general contract for the construction of the Improvements with K-B Construction Company (the "General Contractor").

2.2.5. A collateral assignment of all of Borrower's rights in all permits, licenses and other governmental approvals relating to the Mortgaged Property, of all sales and marketing information and materials relating to the Mortgaged Property, and of such other contracts and agreements relating to the Mortgaged Property as Lender may reasonably request.

2.2.6. A collateral assignment of all "special declarant rights" in favor of or reserved by Borrower pursuant to the Pennsylvania Uniform Planned Community Act, 68 Pa. C.S. §§ 5101-5414 (the "Uniform Act").

The documents referred to above shall be in form and substance satisfactory to Lender.

3. Construction.

3.1. Borrower shall commence construction of the Improvements according to the Plans and Specifications through the General Contractor promptly after signing this Agreement and obtaining all final and unappealable permits and thereafter proceed diligently, employing sufficient workmen and supplying sufficient materials so that the Improvements shall be fully completed and ready for normal use thereof not later than (i) the "Payment Date" (as defined in the Note and as the same may be extended in accordance with the

terms of the Note), with respect to the entire Improvements, (ii) the outside completion date set forth in the applicable Municipal Agreement with respect to work required thereby and (iii) with respect to any Unit that is the subject of an agreement of sale with a purchaser thereof, the date for completion set forth in such agreement of sale.

   3.2.  Borrower further agrees that:

     3.2.1.  The construction shall be performed strictly in accordance with the Plans and Specifications, the Municipal Agreements and all applicable statutes, laws and ordinances, the requirements of all governmental authorities having jurisdiction, and the requirements of the Board of Fire Underwriters (or any other body now or hereafter constituted exercising similar functions) in and for the locality in which the Real Estate is situated.

     3.2.2.  Each Unit when erected will be wholly on a Lot within applicable building restriction lines and will not violate applicable use or other restrictions, whether established in prior conveyances, zoning laws or regulations or elsewhere. Borrower will, upon request, furnish evidence with respect thereto, together with a foundation survey by a licensed surveyor or engineer, showing that the construction is entirely on the appropriate building lot and free from such violations and that there are no encroachments by or on any lot.

     3.2.3.  No amendment shall be made to the Plans or Specifications or the Municipal Agreements without the written approval of the Lender, and, regardless of the nature of the amendment, of any governmental authority having jurisdiction.

     3.2.4.  Immediately after receiving notice from Lender or any governmental authority, Borrower will remove from the Real Estate all materials and all portions of the construction which Lender or any governmental authority may condemn as failing in a substantial way to conform with the Plans and Specifications or applicable laws or the Municipal Agreements and will make good all portions of the construction damaged by such removal.

     3.2.5.  Borrower will provide to Lender facilities commonly made available by responsible general contractors for the inspection of the Mortgaged Property and afford full and free access to all plans, drawings and records with respect to the construction.

   3.3.  Lender may at any time place a superintendent or inspector on the job, whose duties shall be to require that the Improvements are constructed in accordance with the Plans and Specifications. If (and only if) such superintendent or inspector is placed on the job after default by Borrower or the General Contractor, such superintendent or inspector shall be paid an amount specified by Lender which shall be disbursed hereunder and shall be evidenced by the Note and secured by the Mortgage.

   3.4.  Although Lender may inspect and approve the Plans and Specifications, cost estimates, actual construction, and other matters pertaining to construction of the Improvements or exercise its rights under Section 3.3 above, such inspections or exercise of rights are solely for the protection of Lender, and Borrower understands that Lender is not making and will not make any warranties or representations as to any matters pertaining to the Improvements (including, without limiting the generality hereof, the sufficiency of the

3

construction funds, the adequacy of the Plans and Specifications or proper performance by any contractor or subcontractor).

    4.    <u>Advances</u>.

        4.1.    The Loan shall be allocated in accordance with the budget set forth in Exhibit "A" attached hereto and hereby made a part hereof (the "Loan Budget"), but Lender may at its option reallocate the Loan, or any part thereof, among the categories set forth in Exhibit "A" at any time and from time to time. After an initial advance at settlement, Borrower will request advances periodically, but not more frequently than twice monthly, as the work progresses, such request to be on Lender's customary form, signed by any one of Marvin Katz or Steven Katz. Each request for an advance also shall be accompanied by (i) partial releases of liens executed by the General Contractor and by all subcontractors, with respect to all work that was the subject of Borrower's immediately preceding request for an advance, (ii), if requested by Lender, a title search, dated not earlier than five (5) days prior to the date the subject advance is requested to be made, evidencing that no mechanics lien is of record against the Mortgaged Property and (iii) if requested by Lender, a current list, certified by an officer of Borrower, of all subcontractors that have commenced work on the Improvements as of the date of the advance request. Borrower's request for the final construction advance shall also be accompanied by complete releases of liens executed by the General Contractor and all other persons who have the right to claim a lien under the Pennsylvania Mechanics' Lien Law of 1963, as amended.

        4.2.    Advances may be made (directly or through a title insurer) to Borrower, any prime contractor(s), subcontractor(s), materialman and others who have furnished goods or services in connection with the project, or some or any of them, as Lender may elect from time to time.

        4.3.    Applications for advances for direct construction costs shall also be signed by the General Contractor and shall be made in amounts equal to the cost of labor and materials incorporated into the Improvements for which an advance is requested. Payment of each such application will be subject to the certification of Lender's inspecting architect, based on a physical inspection, that the work for which payment is requested has been completed in accordance with the Plans and Specifications, that the cost thereof is as set forth in the application, and that the work is progressing rapidly enough to meet the completion date set forth in Section 3 of this Agreement. However, approval and/or payment of any application shall not constitute a waiver of Lender's rights as to any work or material which may be defective or which may fail to comply with the Plans and Specifications or with the requirements of Section 3 of this Agreement. Notwithstanding the foregoing, any requests for advances for any work done pursuant to any Municipal Agreement must be accompanied by an appropriate certificate of completion signed by the authorized inspector and/or other authorized representatives of the municipality, authority or supplier of services involved and shall be subject to the provisions of Section 4.5 below.

        4.4.    Applications for advances for land and indirect construction costs (such as tap-in fees and Township inspection fees) may be signed by or on behalf of Borrower alone and will include such supporting information as Lender may reasonably require. Borrower hereby irrevocably authorizes Lender to make disbursements from the "Interest Reserve" that is

part of the Loan Budget to pay interest that accrues on the Loan, as and when such payments become due, without any further authorization from Borrower. Lender shall give Borrower prompt notice of the amount of each such drawing. Borrower acknowledges that the "Interest Reserve" in the Loan Budget (i) may not be sufficient to pay interest on the Loan throughout the entire term thereof and (ii) may not, by reason of the operation of Sections 4.7.1 or 4.7.3 below, be available to be drawn upon by Borrower at the time any payment of interest is due under the Note, and in such event Borrower will be responsible to make payments for interest on the Loan out of funds other than the proceeds of the Loan.

4.5. Borrower acknowledges that at the request of Borrower and in order to induce the various municipal authorities to enter into municipal agreements and/or issue necessary building permits, Lender has executed (or may execute) letters of credit, escrow letters and/or the like (collectively, the "Completion Assurance Agreements") certifying the availability of funds for payment of certain costs and expenses for which Borrower is responsible pursuant to any municipal agreements. Borrower agrees that any funds which Lender is required to advance pursuant to any Completion Assurance Agreement shall be deemed to be advances of the Loan and may be made without any further authorization from Borrower. Lender shall not advance any Loan proceeds to Borrower with respect to work that is required to be performed by Borrower pursuant to any municipal agreement that is secured by any Completion Assurance Agreement unless the appropriate municipal authority shall acknowledge to Lender in writing that Lender's liability under such Completion Assurance Agreement is reduced by the amount of the requested advance. Borrower agrees to request, not less frequently than once every sixty (60) days, that the beneficiary of each Completion Assurance Agreement so acknowledge the reduction of Lender's liability thereunder if Borrower has, since the prior such acknowledgment, performed any work that is the subject of a Completion Assurance Agreement.

4.6. If at the time Borrower pays in full the outstanding principal balance of the Loan and all interest and other amounts payable to Lender with respect to the Loan Lender is not fully released, by the beneficiaries thereof, from Lender's liabilities under each Completion Assurance Agreement, Lender shall not be obligated to cancel or return the Note to Borrower or cause the Mortgage to be satisfied unless Borrower shall have deposited with Lender cash in the sum equal to the aggregate amount of Lender's maximum potential liabilities under the Completion Assurance Agreements. Such sum shall be placed in a restricted, interest bearing account with Lender (the "Completion Assurance Account"). In the event that Lender thereafter makes payment to any beneficiary of a Completion Assurance Agreement pursuant to the terms thereof, Lender shall immediately reimburse itself by withdrawing from the Account the amount of Lender's payment to the beneficiary, for which withdrawals this Agreement constitutes Borrower's irrevocable authorization. In order to secure such obligation of Borrower, Borrower shall execute and deliver to Lender, at the time the Account is created, a collateral assignment of the Account to Lender, on Lender's customary form. Borrower may withdraw funds from the Completion Assurance Account from time to time, provided that (i) at the time of each withdrawal Borrower has reimbursed Lender for all amounts thereto paid by Lender pursuant to the Completion Assurance Agreements and (ii) at no time shall the amount in the Completion Assurance Account be less than the then-current aggregate amount of Lender's maximum potential liabilities under the Completion Assurance Agreements.

4.7. Notwithstanding anything to the contrary contained in this Agreement:

4.7.1. Borrower and Lender agree that in no event shall Lender be obligated to advance to Borrower (i) any funds from the Hard Costs, the Marketing/Overhead or the Interest Reserve (Restricted) categories of the Loan Budget unless and until Borrower shall have obtained one or more "firm" agreements of sale for a Unit. After such "firm" agreement or agreements of sale are obtained by Borrower, Borrower shall, subject to the other terms and conditions of this Agreement, be permitted to request, for each "firm" agreement of sale for a Unit which Borrower obtains, an advance from the Marketing/Overhead category of the Loan Budget of $4,500, an advance from the Hard Costs category of the Loan Budget of $155,000 and an advance from the Interest Reserve (Restricted) category of the Loan Budget of $6,000. If, prior to the advance of all "Interest Reserve" and "Marketing/Overhead" funds pursuant to this Section 4.7.1, any "firm" agreement of sale shall be terminated for any reason other than closing under such agreement of sale, for purposes of this Section 4.7.1 all advances out of the Interest Reserve and Marketing/Overhead categories theretofore made shall be attributed to the next "firm" agreement of sale that is delivered to Lender.

4.7.2. Lender shall not at any time advance funds for the construction of any Unit that is not then subject to a "firm" agreement of sale. For purposes of this Agreement, an agreement of sale shall be deemed to be "firm" if (x) the purchaser has paid a cash deposit of not less than 5% of the purchase price or, in the case of FHA financing, the minimum downpayment required by FHA, (y) all contingencies to the purchaser's obligation under the agreement of sale (other than a standard mortgage contingency for not more than 90% of the purchase price and performance of the seller's obligations) have been satisfied and (z) the purchaser has received a public offering statement in satisfaction of the applicable requirements of the Uniform Act. For purposes of this Section 4.7.2 and Section 15.1 below, if any "firm" agreement of sale shall be terminated for any reason other than closing under such agreement of sale, Lender shall not advance any additional funds for the construction of the Unit that was the subject of the terminated agreement until such time as it again is subject to a "firm" agreement of sale.

4.7.3. In no event shall Lender be obligated to make any advance to Borrower if, as a result of such advance, the amount outstanding under the Note would exceed the lesser of (i) $3,000,000 or (ii) the "residual commitment." The "residual commitment" shall mean the difference between (x) $7,800,429 and (y) the greater of (A) the aggregate amount of all sums theretofore repaid on account of principal under the Note or (B) the product of the number of Lots theretofore released from the lien of the Mortgage multiplied by $216,678.59. For purposes of this Section 4.7.3 only, all amounts for which Lender at any time remains liable under the terms of any Completion Assurance Agreement shall be deemed to be outstanding under the Note. At no time will Lender be obligated to advance funds to commence the construction of any Unit on the Real Estate unless, in Lender's reasonable opinion, sufficient funds are available to complete such Unit and all other Units then under construction; that is, that the advance or advances necessary to complete such additional Unit and all other Units then under construction, will not cause the amount outstanding under the Note to exceed, at any time, the lesser of (i) $3,000,000 or (ii) the "residual commitment."

4.7.4. Lender shall not be obligated to advance to Borrower any funds from the "Hard Costs" category of the Loan Budget in excess of $155,000 (the "Maximum Hard Costs Advance") for a Unit.

4.7.5. After the occurrence of an Event of Default (as defined below), Lender shall have the right to apply any funds which it agrees to advance hereunder to bring about the completion of the Improvements and to payment of any taxes, special assessments or any other charges which could be a lien on the Real Estate, or any interest on the Loan, or any premium on any insurance policy affecting the Mortgaged Property.

4.8. If at any time Lender, in the good faith exercise of business judgment, determines that the funds hereby agreed to be advanced (or the undisbursed balance thereof) are insufficient for the purpose of completing the Improvements or of paying any of the aforesaid charges, or any other charge or expense which may have been incurred or may be assumed by Lender in connection with this Agreement, Borrower agrees to pay to Lender the amount of any such deficiency promptly on demand. No amounts so paid to Lender pursuant to this subparagraph shall be deemed to be trust funds, and no interest shall be payable thereon. Any such amounts may be commingled with Lender's other funds and shall be disbursed for the purposes set forth herein before any disbursements are made out of the undisbursed portion of the Loan.

4.9. If Lender shall receive any notice pursuant to §42 Pa.C.S. §8143(b) from a person having or claiming to have a lien or encumbrance on the Mortgaged Property that is subordinate to the lien of the Mortgage, Lender shall not be liable to Borrower if Lender shall thereafter fail or refuse to make any future advance requested by Borrower to be made pursuant to this Section 4 unless Lender's title insurer shall have agreed to endorse Lender's policy of mortgage title insurance to insure the lien of the Mortgage, in the full amount of all advances theretofore made by Lender, including the one then being requested by Borrower, as a first lien on the Mortgaged Property.

4.10. Borrower covenants and agrees that Borrower will comply with all of the provisions of the Pennsylvania Contractor and Subcontractor Payment Act, 73 P.S. §501 et seq., as applicable.

5. Hazard and Liability Insurance.

Borrower shall furnish and maintain insurance as required by the Mortgage. So long as this Agreement is in force the policies of fire insurance shall be in the "Builder's Risk Completed Value Non-Reporting" form. If the fire insurance policies shall be in the "Builder's Risk" form, no portion of the Improvements may be occupied unless Borrower's insurer acknowledges to Lender in writing that such insurance shall remain in effect, notwithstanding the occupancy of the Improvements. In addition to the foregoing, Borrower shall furnish Lender with certificates of comprehensive public liability insurance and worker's compensation insurance, covering Borrower and the General Contractor, if any, in such amounts and form and with such companies as may be satisfactory to Lender in the exercise of reasonable business judgment.

6. <u>Borrower's Warranties</u>.

Borrower, as a material inducement to Lender to make the Loan, represents, warrants, and covenants that:

6.1. There is no litigation pending or threatened which would in any way affect any of the following: title to the Mortgaged Property or any part thereof; the validity or priority of the lien of the Mortgage; issuance or validity of any zoning variance or other zoning or subdivision approval affecting the Mortgaged Property; any building permit or certificate of occupancy which has been or is to be issued in connection with the Mortgaged Property or any part thereof.

6.2. Borrower has obtained a validly issued building permit for all Improvements that are (as of each date this representation is made or deemed made) under construction and such other permits as may be required by law for construction of the Improvements and all appeal periods allowed with respect thereto have expired without any appeal having been filed by any person; the Plans and Specifications are identical in all respects to those on which a building permit has been issued; and the Mortgaged Property now complies, and upon completion of the Improvements will comply, in all respects with all requirements of all applicable federal, state and local statutes, laws, ordinances, rules and regulations, including those relating to building design and construction, zoning, subdivision, and environmental protection.

6.3. No part of the Mortgaged Property has been damaged or taken by, or is under cloud of, eminent domain proceedings.

6.4. The Mortgaged Property is not now damaged or injured as a result of any fire, explosion, accident, flood or other casualty.

6.5. There has been no material adverse change in the financial condition of Borrower or any Guarantor since the date of the loan application previously submitted to Lender.

6.6. The Loan does not violate any other contractual obligation of Borrower or any Guarantor.

6.7. The Mortgaged Property has unqualified access to and from a public road.

6.8. Electricity, potable water and sewerage facilities and, if shown on the Plans and Specifications, natural gas service are available at the Mortgaged Property and are of sufficient capacity to service 36 residential dwelling units.

6.9. The copies of the Municipal Agreements previously delivered to Lender are true, correct and complete copies of the final agreements to be executed by the parties thereto.

8

6.10. Borrower has not executed any leases which presently affect the Real Estate and the Improvements.

6.11. The representations and warranties contained in Article 7 of the Mortgage are true and correct to the best of Borrower's knowledge.

6.12. All contracts entered into by Borrower or subcontracts entered into by the General Contractor with respect to the Improvements shall contain a waiver of mechanics' lien.

6.13. Borrower has delivered to Lender's counsel, for Lender's good faith approval, and Lender has approved, Borrower's proposed public offering statement for the Real Estate and of all required attachments thereto (other than condominium plans) that pertain to the Real Estate (the "Association Documents"). Borrower covenants that Borrower will promptly deliver to Lender copies of all future amendments thereto. Lender agrees that, within ten (10) business days after Lender's counsel receives any subsequent proposed amendment to the Association Documents, Lender shall advise Borrower in writing of any objections Lender has to such documents (and the failure of Lender to deliver such notice shall constitute Lender's approval thereof.) Once so approved, Borrower shall not amend or revise any of the Association Documents without Lender's prior, good faith written approval thereof. Borrower also covenants that during such period as Borrower controls the "Association" (as defined in the Uniform Act), the Association shall not be merged with any other Association. Lender agrees to execute, in form acceptable to Lender in good faith, a recordable instrument whereby the lien of the Mortgage is subordinated to each set of approved Association Documents.

Each request for an advance of proceeds of the Loan hereafter made by Borrower shall constitute Borrower's representation and warranty that (i) the representations and warranties contained in this Article are true and correct as of the date such request for an advance is made and (ii) all proceeds of the Loan theretofore disbursed by Lender to pay for labor and materials have been applied and paid in strict accordance with all prior requests for advances.

7. Fees and Expenses.

At or before the time of the first advance on account of the Loan, Borrower will pay Lender $35,290 to defray the costs involved in processing and administering the Loan. In addition, Borrower shall pay to Lender when billed a fee of one-half of one percent (1/2%) per annum of the face amount of any Completion Assurance Agreement issued by Lender pursuant to this Agreement. No portion of said fees shall be refundable if the maturity date of the Note is accelerated or if Borrower makes any voluntary prepayment of the Loan. In addition, Borrower will pay or cause to be paid all other fees and charges incurred in the procuring and making of the Loan, including, without limitation, fees and expenses relating to examination of title, title insurance premiums, surveys, recording charges, appraisal fees and Lender's appraisal review fee, plans and cost review fee, any applicable documentary, transfer, recording or other similar taxes, Lender's counsel fees for the preparation of Loan documentation and the closing of the Loan and disbursements, inspection fees to Lender's inspector of not more than $250.00 per inspection. Notwithstanding the absence or existence of any default hereunder, Borrower shall pay upon demand any costs, expenses and attorneys' fees incurred by Lender in connection with

9

any bankruptcy or insolvency proceeding filed by or against Borrower whether such costs, expenses or attorneys' fees, incurred in the sole discretion of Lender are related to the review, determination, protection, monitoring (including attendance at meetings or hearings) or enforcement by Lender of the indebtedness evidenced by the Note, including but not limited to the preparation and filing of any proof of claim and without regard to whether Lender files, responds to or is a party to any application, motion or other proceeding.

8. No Third Party Beneficiaries.

The parties do not intend the benefits of this Agreement to inure to any third party. Notwithstanding anything contained herein or in the Mortgage, Note or any other document executed in connection with this transaction, or any conduct or course of conduct by either or both of the parties hereto, or their respective affiliated companies, agents or employees, before or after signing this Agreement or any of the other aforesaid documents, this Agreement shall not be construed as creating any rights, claims or causes of action against Lender, or any of its officers, agents or employees in favor of any prime contractor or any other contractor, subcontractor, supplier of labor or materials or any of their respective creditors, or any other person or entity other than Borrower. Without limiting the generality of the foregoing, advances made directly to any prime contractor or any other contractor, subcontractor or supplier of labor and materials, shall not be deemed a recognition by the Lender of a third-party beneficiary status of any such person or entity.

9. Mechanics' Liens.

If any mechanic's lien or security interest shall be filed against the Mortgaged Property or any part thereof, or any interest therein, by reason of work, labor, services or materials supplied or claimed to have been supplied, or any municipal lien or other lien or encumbrance, other than the Mortgage, is recorded or filed and is not discharged (or if security therefor satisfactory to Lender has not been deposited with Lender) within thirty (30) days after the filing or recording thereof, then Lender may, at its option, pay and discharge said lien or encumbrance, in which case the sum which Lender shall have so paid shall be considered as part of the advances then due or thereafter to become due, as Lender may elect. Borrower shall within three (3) business days after Borrower has actual knowledge of the filing of any such lien or claim of a lien, give Lender prompt written notice thereof and of the lienor, the amount of the lien asserted and Borrower's response thereto.

10. Default.

The occurrence of any one or more of the following shall, at the option of Lender, and upon written notice from Lender to Borrower, constitute an "Event of Default" hereunder:

10.1. A petition shall have been filed by Borrower under any of the provisions of the Federal Bankruptcy Act, as amended, or any other Federal or state insolvency or similar law; or such petition shall have been filed against Borrower or a receiver shall have been appointed in a debtor's proceeding for Borrower, or any part of its property or assets, or for

the Mortgaged Property or any part thereof, and such petition or receivership shall continue unstayed and in effect for a period of thirty (30) days;

10.2. Borrower shall have made an assignment for the benefit of its creditors;

10.3. Any execution shall have been levied against the Mortgaged Property or against any other property of Borrower and shall continue unstayed and in effect for a period of ten (10) days;

10.4. Work in the construction of the Improvements shall have been discontinued for five consecutive business days for any reason whatsoever, except strikes, weather, Acts of God or similar elements of force majeure;

10.5. Borrower shall have created any security interest in favor of any party other than Lender in any fixtures, machinery or equipment used or to be used in connection with the Improvements, or purchased any of the aforesaid items on any conditional sale basis;

10.6. Borrower shall have failed to comply with any requirements of any governmental authority concerning the Improvements within such period as may be allowed by such governmental authority, after notice in writing of such requirements shall have been given to Borrower but such failure shall not constitute an Event of Default if Borrower shall have filed a timely appeal from such requirement and diligently pursues such appeal and if enforcement against the Mortgaged Property is stayed during the pendency of such appeal, provided that in Lender's reasonable judgment a subsequent denial of such appeal following continued construction during the pendency of the appeal will not materially adversely affect Borrower's ability to complete the Improvements as required by this Agreement;

10.7. Borrower shall have failed to disclose to Lender, upon demand, the names of all persons with whom Borrower has contracted or intends to contract in connection with the construction of the Improvements or the furnishing of any labor, materials or services in connection therewith;

10.8. Borrower shall have made any material amendment in any contract with any general contractor or architect engaged by Borrower or failed to pursue promptly any remedy under any such contract in the event of any material default by the other party thereto (without Lender's written consent);

10.9. Borrower shall have failed to observe and perform each and every one of the terms, covenants, promises and agreements on its part to be observed and performed under this Agreement and such failure is not cured within twenty (20) days after written notice to Borrower (but if such failure is susceptible to being cured but cannot be cured within such 20 day period, such shall not become an Event of Default as long as Borrower commences such cure within such 20 day period and diligently prosecutes such cure to its completion) or any representation or warranty made by Borrower shall appear to have been false or incorrect in any material respect when made;

11

10.10. There shall have occurred any "Event of Default" under the terms of the Note, the Mortgage or any of the other documents delivered to Lender in connection with the Loan (including, without limitation thereto, the Municipal Agreements);

10.11. Borrower , any Guarantor or any entity that is controlled by any Guarantor (a "Related Entity") shall have defaulted in any respect under any note, mortgage, loan agreement or any collateral document executed by Borrower or any such Guarantor or Related Entity under or in connection with any loan transaction involving Borrower or such Guarantor or Related Entity and Lender other than the Loan which is the subject of this Agreement, whether such other loan transaction(s) or any of them, has been entered into prior to the date hereof or is entered into after the date hereof;

10.12. Borrower shall have entered into written or oral leases for any part of the Mortgaged Property without the prior written consent of Lender.

For purposes of Sections 10.1, 10.2 and 10.3 above, the word "Borrower" shall include Borrower and each Guarantor.

11. <u>Remedies</u>.

11.1. Upon the occurrence of any Event of Default, Lender may exercise any or all of the following rights and remedies as it may deem necessary or appropriate:

11.1.1. Declare immediately due and payable all sums advanced under the Note which are then unpaid, with all accrued interest.

11.1.2. Take possession of the Mortgaged Property and all materials, supplies, tools, equipment and construction facilities and appliances located thereon, and proceed either in the name of Lender or in the name of Borrower as Lender shall elect, to complete the Improvements at the cost and expense of Borrower (subject to Lender's right to discontinue work at any time). If Lender elects to complete or cause the Improvements to be so completed, Lender will not assume any liability or be liable to Borrower or to any other person for completing the Improvements or for the manner or quality of construction, and Borrower expressly waives any such liability. If Lender elects to complete or cause the Improvements to be so completed, it may do so according to the Plans and Specifications or according to such changes, alterations or modifications in and to the Plans and Specifications as Lender may deem expedient or necessary, and Lender may enforce or cancel all existing contracts pertaining to the construction or make other contracts which in Lender's opinion may seem advisable, and Borrower shall pay or cause to be paid Lender upon demand any amount or amounts expended by Lender for such performance, together with any other costs, charges or expenses incident thereto or otherwise incurred or expended by Lender in connection with the Improvements, and the amount so expended shall bear interest at the applicable rate provided in the Note and shall be considered part of the indebtedness evidenced by the Note and secured by the Mortgage, regardless of whether such expenditures cause Borrower's indebtedness to Lender to exceed the face amount of the Note. For the purpose of securing Borrower's obligations hereunder, Borrower hereby assigns, transfers and sets over to Lender all of Borrower's right, title and interest in, to and under (i) the Plans and Specifications, (ii) all building and other permits issued

12

by any municipal authority with respect to the Improvements (whether heretofore or hereafter issued) and (iii) all of the benefits (but none of the obligations) of Borrower under the Municipal Agreements; provided that Lender shall not exercise its rights under the aforesaid assignment until default by Borrower hereunder.

11.1.3. Refrain from making any one or more disbursements of Loan proceeds which Borrower would otherwise be entitled to have made hereunder.

11.2. In any action or proceeding for recovery of any sums expended by Lender in connection with the completion of the Improvements, a statement of such expenditures, verified by the affidavit of an officer of Lender, shall be prima facie evidence of the amounts so expended and of the propriety of and necessity for such expenditures, and the burden of proving the contrary shall be upon Borrower.

11.3. The remedies provided in this Agreement shall be in addition to and not in substitution for the rights and remedies which would otherwise be vested in Lender under the Note and Mortgage or otherwise at law or in equity, all of which rights and remedies are specifically reserved by Lender. Failure of Lender to exercise any remedy shall not constitute a waiver of Lender's rights for that default nor for any further or future default.

11.4. Borrower agrees that all property of Borrower which may hereafter be deposited with or come into the possession of Lender shall be applicable to secure the payment of the indebtedness evidenced by the Note, and for this purpose Lender is hereby given a lien on and a security interest in all thereof, and for such purpose this Agreement shall constitute a security agreement under the Uniform Commercial Code.

12. **Notices.**

All notices to be given by either party to the other hereunder shall be in writing, shall be addressed to Borrower at its offices, as hereinabove set forth, and to Lender at its office, as hereinabove set forth (attention: Real Estate and Construction Finance Department), and shall be delivered by either an independent courier service that obtains a receipt for delivery or certified or registered U.S. Postal Service mail, return receipt requested. Either party may change its address for notices by written notice to the other party as aforesaid.

13. **Indemnity.**

Borrower agrees to protect, indemnify, defend and save harmless Lender and its directors, officers, agents and employees from and against any and all loss, liability, and expense (including reasonable counsel fees) arising out of disputes between Borrower and its general contractor, if any, or between any contractor and any subcontractor, materialman or supplier, or between Borrower or any contractor or any subcontractor and any municipal or public authority, or between Borrower and any broker pertaining to this transaction or (ii) any violations or alleged violations by Borrower of the requirements of the Uniform Act

14. Release.

Lender agrees to release individual Lots and the Units thereon from the lien of the Mortgage in accordance with the provisions of Section 19.1 of the Mortgage. The "release price" for each Lot and Unit which Borrower requests that Lender release from the lien of the Mortgage shall be $70,930 plus an amount equal to 100% of the portion of the Loan proceeds from the Hard Costs category of the Loan Budget advanced for such Unit.

15. Sales Covenants.

15.1. Borrower shall obtain "firm" agreements of sale, determined on a cumulative basis, for at least six (6) dwelling units in Phases I, II and III (as shown on the "Plan"), in the aggregate, during each six (6) month period that begins with each June and December during the term of the Loan, beginning with the period that commenced on December 1, 2006.

15.2. Borrower shall deliver to Lender, on or before the 10th day of each month, a written statement setting forth all agreements of sale then in effect with respect to the Mortgaged Property, in such detail as Lender may in good faith require, including without limitation, a report on the current status of all agreements of sale reported on prior statements.

16. Conflicts Between Instruments.

In the event of any conflict between the provisions of this Construction Loan Agreement and the provisions of the Note, Mortgage or any other document executed and/or delivered in connection with the Loan (including, without limitation any provisions with respect to the delivery of notice of default and the granting of any opportunity to cure) the provisions of this Agreement shall prevail, notwithstanding any provision in any other document to the effect that such other document shall be deemed controlling. Any default by Borrower hereunder shall, after the granting of such notice and expiration of any grace period as may be herein contained, constitute an event of default under the Note and Mortgage, without regard for any requirement for notice or opportunity to cure contained in the Note or Mortgage.

17. Captions.

The captions contained herein are not a part of this Agreement. They are only for the convenience of the parties and do not in any way modify, amplify, or give full notice of any of the terms, covenants or conditions of this Agreement.

18. Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

19. CONSENT TO JURISDICTION AND VENUE.

IN ANY LEGAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT

OR THE RELATIONSHIP EVIDENCED HEREBY, BORROWER HEREBY IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN BUCKS, MONTGOMERY OR PHILADELPHIA COUNTIES IN THE COMMONWEALTH OF PENNSYLVANIA AND AGREES NOT TO RAISE ANY OBJECTION TO SUCH JURISDICTION OR TO THE LAYING OR MAINTAINING OF THE VENUE OF ANY SUCH PROCEEDING IN SUCH COUNTY. BORROWER AGREES THAT SERVICE OF PROCESS IN ANY SUCH PROCEEDING MAY BE DULY EFFECTED UPON IT BY MAILING A COPY THEREOF, BY REGISTERED MAIL, POSTAGE PREPAID, TO BORROWER.

20. <u>Time of the Essence</u>.

Time shall be the essence of this Agreement.

21. <u>Relationship of Parties</u>.

The relationship between Borrower and Lender shall at all times be that of debtor and creditor. Under no circumstances shall such relationship be construed as creating a partnership or joint venture between Borrower and Lender.

22. <u>Severability</u>.

Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability but shall not invalidate or render unenforceable any other provision of this document and the remaining provisions shall stay in full force and effect.

23. <u>No Implied Waiver</u>.

Lender shall not be deemed to have modified or waived any of its rights or remedies hereunder or under the Note, Mortgage or any other document executed in connection with the Loan unless such modification or waiver is in writing and signed by Lender, and then only to the extent specifically set forth therein. A waiver in any one event shall not be construed as continuing or as a waiver of or bar to the exercise of such right or remedy with respect to any subsequent event or occurrence.

24. **<u>WAIVER OF JURY TRIAL</u>.**

**BORROWER AND LENDER, AFTER CONSULTATION WITH THEIR RESPECTIVE COUNSEL, EACH HEREBY WAIVE ANY RIGHT WHICH THEY MAY HAVE TO A JURY TRIAL IN CONNECTION WITH ANY SUIT COMMENCED BY OR AGAINST THEM IN CONNECTION WITH THIS AGREEMENT OR WITH ANY DOCUMENT EXECUTED IN CONNECTION WITH THIS AGREEMENT OR THE LOAN, OR IN ANY WAY PERTAINING TO THE LOAN.**

PHDATA 1412966_5

25. <u>Operating Accounts</u>.

In order that Lender may better monitor the progress of construction of the Improvements and Borrower's compliance with the terms of this Agreement, Borrower shall open and maintain with Lender throughout the term of the Loan all operating deposit accounts for the Property, into which account all Loan proceeds and proceeds from operation of the Property shall be deposited and from which all costs of the project and expenses of the Property shall be paid.

26. <u>Publicity</u>.

By accepting this commitment the Borrower authorizes Lender to erect on the Real Estate and maintain until its completion Lender's customary sign or signs stating that it is the construction lender (and at its discretion also announcing any participants in the Loan), determined by Lender from time to time, provided that the location of the sign or signs will not interfere with construction of the Improvements and shall be subject to Borrower's reasonable approval. Such signs shall be erected at Lender's expense and shall comply with all applicable ordinances, rules and regulations. Lender shall also have the right to publicize its involvement as construction lender for the project in such print media and by such other means as Lender deems appropriate.

27. <u>Entire Agreement; Amendments</u>.

This Agreement and the documents referred to herein constitute the entire agreement and understanding between Borrower and Lender with respect to the Loan; all prior negotiations, correspondence and discussions between the parties and their employees, partners, officers, agents and representations with respect to the Loan and the Mortgaged Property are

merged into this Agreement and shall have no force or effect. This Agreement may be amended or modified only by a writing signed by the parties hereto.

IN WITNESS WHEREOF, the parties hereto have hereunto set their respective hands and seals the day and year first above written.

WACHOVIA BANK, NATIONAL ASSOCIATION

By: _____
Julie Pasceri-Young
Vice President


LAMPLIGHTER VILLAGE ASSOCIATES, L.P.,
a Pennsylvania limited partnership, by its General Partner:

Lamplighter Village Partners, LLC, a Pennsylvania limited liability company

By: _____
Marvin Katz, Manager

17

Exhibit "A"
Loan Budget

|  | Total Cost | Equity | Total Loan |
|---|---|---|---|
| Land | $911,880.00 | $204,544.00 | $ 707,336.00 |
| Site Improvements | $ 620,318.29 | $ -- | $ 620,318.29 |
| Township Fees (Sewer/Water) | $ 200,208.00 | $ -- | $ 200,208.00 |
| Township Inspection Fee | $ 40,476.94 | $ -- | $ 40,476.94 |
| **Total Site** | $1,772,883.23 | $204,544.00 | $1,568,339.23 |
| Marketing & Overhead | $ 162,000.00 | $ -- | $ 162,000.00 |
| Loan Fee | $ 35,290.00 | $ -- | $ 35,290.00 |
| Legal, Title, Closing Costs | $ 30,000.00 | $ -- | $ 30,000.00 |
| Interest Reserve (Restricted) | $ 216,000.00 | $ -- | $ 216,000.00 |
| Interest Reserve (Unrestricted) | $ 72,000.00 |  | $ 72,000.00 |
| Architect and Engineering | $ 136,800.00 | $ | $ 136,800.00 |
| Hard Costs | $5,580,000.00 | $ -- | $5,580,000.00 |
| **Total Project** | $8,004,973.23 | $204,544.00 | $7,800,429.23 |

PHDATA 1412966_5